STATE of Missouri, Plaintiff–Respondent,

v.

Tina GAVER, Defendant–Appellant.

No. 20893.

Missouri Court of Appeals, Southern District, Division One.

April 23, 1997.

Ellen H. Flottman, Asst. Public Defender, Columbia, for defendant–appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Becky Owenson Kilpatrick, Assistant Attorney General, Jefferson City, for plaintiff–respondent.

GARRISON, Judge.

Tina Gaver (Defendant) was convicted by a jury of four counts of the class D felony of endangering the welfare of a child in the first degree, § 568.045, RSMo Cum.Supp.1993. On this appeal, she contends that there was insufficient evidence to support her convictions, and that the trial court violated her right to be free from double jeopardy.

Scott Gaver and Defendant had twin sons, Justin and John, who were born November 8, 1993. On January 2 or 3, 1994, Mike Austin, a social worker with the Division of Family Services (DFS) of Wright County, visited the Gavers' apartment in Mountain Grove, Missouri, to investigate a report of abuse and neglect. Austin discovered a slight bruise on John's left cheek, which Scott and Defendant explained by saying that John might have hurt himself while in his crib. When Austin asked Scott and Defendant to take John and Justin to the doctor, he was informed that they already had an appointment the following day for a two-month checkup.

Dr. Nancy Hayes examined both John and Justin the next day. She found that Justin had abrasions over the tip of his nose and his upper lip, which could have been caused by himself or someone else rubbing his face on a blanket. John had a torn frenulum,[1] bruises

---

1. The frenulum was described by Dr. Hayes as the "little tag under your tongue," and that inju-

on his left and right cheeks, and a small hemorrhage, or blood spot, in his left eye. According to Dr. Hayes, the injuries to John could not have been self-inflicted or inflicted by Justin, and the bruises on his cheeks could have been caused by being slapped. When Dr. Hayes pointed out these injuries, Scott and Defendant explained that John and Justin slept together and that one could have rolled over the other. When she told them that their explanation did not match the injuries, the parents said that they had left the children with Scott's sister over the weekend and that perhaps something had happened there. Dr. Hayes informed Scott and Defendant that the injuries suffered by the children, especially John, were not accidental, that they needed to be more careful with whom they left their children, and that they needed to be very scrupulous about their attention to the children.

Dr. Hayes again examined John on January 20, 1994, when Defendant took him to the hospital after he appeared to have trouble catching his breath. An x-ray was taken of John, but Dr. Hayes neither saw it nor alerted hospital personnel to look for anything other than pneumonia. John was released from the hospital on January 22 and, according to Dr. Hayes, she was not aware of any findings indicating trauma.

On January 25, 1994, a DFS worker visited the Gaver residence, observed both children, and watched Defendant change the children's diapers. While the worker made no notations in her report of any bruising on the children, she did tell her DFS supervisor that she saw a "little bit of redness" when their diapers were changed. John was returned to Dr. Hayes' office for a follow-up visit on January 28 and was examined by Dr. Goodwin, another physician in the clinic. Dr. Goodwin's notes contained no indication that he found any evidence of abuse.[2]

On February 12, 1994, Defendant was away from the apartment for about fifteen minutes. When she returned, Scott was holding John, who was limp. Scott told her, "I think I dropped him." Defendant ran

outside and yelled for someone to call an ambulance. Sheila Crisp, who was in a neighboring apartment, went to their apartment when she heard Defendant yelling for help. When she got there, she saw Defendant screaming and crying with a baby in her arms. Crisp took the baby from Defendant because she thought Defendant was too upset to hold him. John was taken by ambulance to the Texas County Hospital. One of the paramedics testified that while attending to John, he noticed some bruising with redness and swelling on John's back, as well as a small abrasion. He also testified that John had a bruise on his left buttock which appeared older than the bruise on his back.

John was transferred to Cox South Hospital in Springfield the same day, and had two seizures while en route. Dr. Griesemer, a pediatric specialist, attended to John upon his arrival and admitted him to intensive care. According to Dr. Griesemer, John would fluctuate between being extremely irritable and drifting in and out of consciousness.

A CT scan revealed two subdural hematomas (blood clots above the brain), which were causing John's fluctuating levels of consciousness, as well as bleeding inside his brain. X-rays were also taken and, according to Dr. Griesemer, "almost every film that came out had some kind of fracture on it." In particular, there was a compression fracture of the "L-5" (the lower back), two rib fractures, a fracture of the right tibia and fibula, and a fracture of the left femur. Dr. Griesemer also discovered bruises on John's chest, buttocks, lower right leg and right thigh.

Dr. Griesemer spoke with Scott and Defendant several times at the hospital. Scott told him that John had fallen from his arms onto the floor. Dr. Griesemer also spoke with Defendant about John's history because his injuries were not consistent with a four-hour-old injury. Dr. Griesemer testified that Defendant told him that John had some jerking episodes of his right arm around noon that day, but both Scott and Defendant de-

---

ries to it are "usually caused by someone jamming something in their mouth."

2. Dr. Goodwin did not testify at trial. Dr. Hayes, however, referred to their office records, including Dr. Goodwin's notes, when she testified.

nied that John had sustained any other falls or injuries. According to Dr. Griesemer, there was no question that John had been abused, none of the injuries were accidental, the two injuries to the head were life threatening, and the injuries had occurred at various times over a period of up to six weeks.

Because of the discovery of John's injuries, Justin was taken from Sheila Crisp's home around 3:00 a.m. on February 13 by authorities and placed in temporary foster care with Onita Top. That night, Top slept in a chair holding Justin, who whimpered if held certain ways. As she prepared to give Justin a sponge bath later that morning, she noticed bruising on his buttocks, which she photographed before taking him to Cox South Hospital.

Dr. James Wilson examined Justin at the hospital and found a deformity of Justin's right wrist and bruising over both buttocks. He diagnosed a fracture to the right wrist, and also discovered bilateral rib fractures involving several ribs, a "buckling-type" fracture to the left tibia, and a fracture to the right femur. He said that the bruises had occurred at different times and that some of the fractures had already started to heal, indicating that they were not of recent origin.

Scott and Defendant were subsequently interviewed by a DFS worker and a sheriff's deputy. Scott, who was placed under arrest, told the deputy that he had abused the children, but that all the abuse occurred when Defendant was either outside of the home or in an adjoining room. Defendant claimed she had no knowledge of Scott mistreating John and Justin, but she admitted that he had said that the babies were a "handful," he would get nervous and upset on occasion when the babies cried, and would sometimes have to "go outside." Defendant also related an incident, which she said could have been in late January or early February, when Scott was changing John's diaper in another room and she heard the baby crying. When she investigated, Scott said that he had heard the baby's leg pop, but she did not notice anything wrong with the baby. Defendant also said that the walls of their small apartment were thin and that she could hear if there were noises in the next room when Scott was alone with the children. She denied having any knowledge of her husband's abuse of their children, and stated that she never saw any bruising or other indication of injury, despite bathing and changing them daily.

Defendant was charged with four separate counts of endangering the welfare of a child in the first degree, § 568.045, RSMo Cum. Supp.1993. In each, she was charged with knowingly acting in a manner that created a substantial risk to the child's life, body and health, by failing to protect the child and provide a safe environment after being advised that someone was abusing the child and after observing further signs of abuse, to wit, bruises. Counts I and II charged Defendant with endangering the welfare of John from February 5 to February 12, 1994, and January 29 to February 5, 1994, respectively. Counts III and IV charged her with endangering Justin's welfare during the periods of February 6 to February 12, 1994, and January 16 to February 6, 1994, respectively. Following guilty verdicts, Defendant was sentenced to five years' imprisonment on each count, with Counts I and II to be served consecutively, Counts III and IV to be served consecutively, and Counts I and II to be served concurrently with Counts III and IV.

## POINT I

In her first point relied on, Defendant contends that the trial court erred in overruling her motion for acquittal at the close of all the evidence because of the insufficiency of the evidence. She argues that there was insufficient evidence to prove (1) that she knew of the abuse by Scott, and (2) that she knew of the abuse during the time frame charged in Counts II and IV, to wit: before February 6, 1994.

An individual commits the crime of endangering the welfare of a child in the first degree if he or she "knowingly acts in a manner that creates a substantial risk to the life, body, or health of a child less than seventeen years old." § 568.045.1, RSMo Cum.Supp.1993. "A person 'acts knowingly,' or with knowledge, (1) With respect to his conduct or to attendant circumstances when

he is aware of the nature of his conduct or that those circumstances exist; or (2) With respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result." § 562.016.3, RSMo 1994. On this appeal, Defendant does not dispute that the lives and health of John and Justin were placed at substantial risk. She argues that "[t]here is no doubt that Scott hurt the children horribly.... Yet the state has failed to establish beyond a reasonable doubt that [Defendant] was also culpable in their abuse by knowingly failing to protect them from Scott Gaver."

█ In reviewing a challenge to the sufficiency of the evidence, we accept as true all of the evidence favorable to the verdict, including all favorable inferences drawn from the evidence, and disregard all evidence and inferences to the contrary. *State v. Grim*, 854 S.W.2d 403, 405 (Mo. banc), *cert. denied*, 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993). "These principles apply whether the evidence is direct or circumstantial." *State v. Martin*, 882 S.W.2d 768, 770 (Mo.App. E.D.1994).

█ "Weighing the evidence to determine whether the defendant was guilty beyond a reasonable doubt is the role of the jury and not the function of the reviewing court." *State v. Simpson*, 718 S.W.2d 143, 146 (Mo. App. W.D.1986). Instead, we "determine only whether there was evidence from which reasonable persons could have found the defendant guilty." *State v. Mishler*, 908 S.W.2d 888, 891 (Mo.App. S.D.1995).

█ Defendant first contends that the evidence presented was insufficient to support a finding that she knowingly acted in a manner that created a substantial risk to the life, body, or health of John and Justin. She argues that the record supports the "inescapable conclusion that [she] *could* have known of the abuse; perhaps that she *should* have known; but that the state's evidence falls far short of proof that [she] *did* know that [Scott] was hurting her babies."

█ "Direct proof of the required mental state (here 'knowingly') is seldom available and such intent is usually inferred from circumstantial evidence. Mental elements establishing that a defendant knowingly did an act may be proved by indirect evidence and inferences reasonably drawn from circumstances surrounding the incident." *State v. Abercrombie*, 694 S.W.2d 268, 271 (Mo. App. S.D.1985).

In *State v. Mahurin*, 799 S.W.2d 840 (Mo. banc 1990), *cert. denied*, 502 U.S. 825, 112 S.Ct. 90, 116 L.Ed.2d 62 (1991), a mother and father were convicted under § 568.050, RSMo 1986,[3] with endangering the welfare of their twin son who was found to be suffering from starvation. They were also convicted of involuntary manslaughter as the result of the death of the other twin from malnutrition. On appeal, they contended that the evidence was insufficient to prove that they acted knowingly in endangering the welfare of their child. *Id.* at 844. The evidence indicated that the parents had been given instruction on infant care, but when the child was discovered by authorities, he was "skin and bones." *Id.* at 842. In rejecting their claim, the court said:

> Based on the physical appearance of the infants as described by examining physicians, it is reasonably certain that [Mother] should have recognized the grave condition of her twins. [Father], along with [Mother], was given instructions on infant care. [Father] also should have been aware that something was wrong with the babies because of their appearance. Although he testified that the couple was separated for certain periods after the birth of the twins, he came to see the children often and was in any event obligated to see to his children's health and welfare.

*Id.* at 844.

In the instant case, the State called several doctors at trial who testified about the nature, extent and approximate ages of the

---

**3.** Section 568.050.1(1), RSMo 1986, is substantially similar to the statute under which Defendant is charged in this case, § 568.045.1, RSMo Cum.Supp.1993. It provided the following: "A person commits the crime of endangering the welfare of a child if: (1) He knowingly acts in a manner that creates a substantial risk to the life, body or health of a child less than seventeen years old."

injuries, based on their own examinations of the twins or their examination of x-rays and photographs. In addition to the evidence of the multiple, serious injuries suffered by John and Justin at various times, Dr. Hayes testified that she had informed Defendant on or around January 3, 1994, of the possibility that someone was abusing her children. She told Defendant that the injuries suffered were not accidental and that she should be especially careful with the children.

There was evidence that the numerous injuries suffered by John and Justin occurred at different times; they were in obvious discomfort; and they had injuries which would have been obvious. There was also medical testimony that it would have been impossible for a person rendering any level of care to the children not to have seen the bruises which the children sustained. While Defendant acknowledges this testimony, she essentially argues that the weight of the credible evidence demonstrates that she did not knowingly commit these offenses. In this regard, the following language is apropos:

> The jury, however, was not required to believe Defendant's testimony. Credibility and weight of testimony are for the jury to determine, and a jury may believe all, some or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case. The jury is entitled to accept the state's evidence as true, and reject the defendant's testimony as false. While the circumstances need not be absolutely conclusive of guilt, they need not demonstrate the impossibility of innocence; while the jury may have chosen to acquit, they did not.

*State v. Mishler*, 908 S.W.2d at 893 (citations omitted).

As in *Mahurin*, there was sufficient evidence from which a reasonable juror could have found that Defendant knowingly endangered the welfare of her children. The trial court did not err in overruling her motion based on this contention at the close of all of the evidence.

■ Defendant also contends that the evidence was insufficient as it relates to Counts II and IV. Count II was based on her knowledge of abuse of John between January 29 and February 5, 1994, and Count IV was based on her knowledge that Justin was being abused during the period of January 16 to February 6, 1994. She argues that the evidence was insufficient to support a conviction on either count because it did not establish her knowledge of abuse before February 6, 1994. We disagree.

We note that John was hospitalized on February 12, 1994. According to the testimony of Dr. Griesemer, who cared for him upon his arrival at the hospital, the compression fracture of the lower back was "older," the fractures of the ribs and right leg were six to eight weeks old, and the bruises ranged in age from six to fourteen days.

The State also presented the testimony of Dr. Douglas Beale, a pediatric specialist and medical consultant who assists in the investigation of serious cases of abuse and neglect. He testified based upon his examination of the hospital records, investigative summaries, x-rays and photographs and concluded that the fractures of John's ribs, leg and back were four to six weeks old, and that his bruises ranged in age from less than five days to two to four weeks.

Justin was photographed by Top on February 13, 1994, before being taken to the hospital where he was examined by Dr. Wilson and x-rayed. Dr. Wilson testified that Justin's bruising had occurred at different times with some as recent as seven to ten days and others as old as two to three weeks. He also said that Justin's fractures had already started to heal, indicating that they were not of recent origin. Dr. Beale gave his opinion that Justin's rib and wrist fractures were four to six weeks old, and that his bruises ranged in age from five days or less to several which were two to four weeks old.

There was, therefore, evidence to support a finding that both John and Justin had observable injuries prior to February 6, 1994. Accordingly, this portion of Defendant's argument is not well taken.

Point I is denied.

## POINT II

 In Defendant's second point on appeal, she contends that the sentences imposed by the trial court violated her right to be free from double jeopardy. She argues that the crime with which she was charged was one characterized by a "continuing course of conduct," and as such, the State violated her right to be free from double jeopardy when it charged her twice for endangering each child, to wit: John from January 29 through February 5, 1994 (Count II), and from February 5 through February 12, 1994 (Count I); and Justin from January 16 through February 6, 1994 (Count IV), and from February 6 through February 12, 1994 (Count III).

Defendant, however, did not raise the issue of double jeopardy at trial, nor did she include it in her motion for new trial. Defendant acknowledges this failure, but presents the question to this court for plain error review.

In *State v. Baker,* 850 S.W.2d 944, 947 (Mo.App. E.D.1993), the Eastern District encountered a similar request for plain error review. In that case, the appellant alleged that the trial court plainly erred in accepting the guilty verdicts on four counts of possession of a weapon because his possession of four knives actually constituted only a single offense. *Id.* The court said:

> Because counsel for appellant failed to raise the issue of double jeopardy in the trial court, appellant requests that we review this point for plain error. However, it is well-settled that double jeopardy is a personal right which, if not properly raised, is waived. *State v. Miner,* 748 S.W.2d 692, 693 (Mo.App. E.D.1988). As appellant was remiss in raising his double jeopardy claim at trial and in post-trial motions, we find appellant has waived this right.

*Id.*

This court has also discussed this issue. In *Horsey v. State,* 747 S.W.2d 748, 754–56 (Mo.App. S.D.1988), we held that the movant waived his claim of double jeopardy by failing to assert it before trial. *See also Rost v. State,* 921 S.W.2d 629, 635–36 (Mo.App. S.D. 1996).

Defendant's failure to raise the issue of double jeopardy in the trial court results in a waiver of that claim, and we therefore refuse to entertain her allegation of error, plain or otherwise. Defendant's second point is denied.

Affirmed.

BARNEY, P.J., and PREWITT, J., concur.