**STATE of Missouri, Respondent,**

v.

**Michelle Rene FUELLING, Appellant.**

**No. WD 62593.**

Missouri Court of Appeals,
Western District.

July 20, 2004.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 31, 2004.

Application for Transfer Denied
Oct. 26, 2004.

Ruth Sanders, Kansas City, MO, for Appellant.

Andrea K. Spillars, Jefferson City, MO, for Respondent.

Before JOSEPH M. ELLIS, C.J., PATRICIA A. BRECKENRIDGE and THOMAS H. NEWTON, JJ.

THOMAS H. NEWTON, Judge.

Ms. Michelle R. Fuelling appeals from the judgment of the trial court, which convicted her of endangering the welfare of a child in the first degree [1] and felony murder in the second degree.[2] The case stems from the death of Ms. Fuelling's child, Raven, who was killed by her husband, Mr. Carlos Mendoza. At issue in this appeal is the mental element of the child endangerment crime. Ms. Fuelling argues that the trial court misstated and misapplied the law as it pertains to the required mental element of the crime when the court referred to a "reasonable person" standard rather than the correct "actual knowledge" standard.

She further argues that the State presented insufficient evidence to establish that she possessed the required "actual knowledge" and that the trial court, therefore, could only convict her of the lesser-included offense of endangering the welfare of a child in the second degree. Because that crime is a misdemeanor, rather than a felony such as endangering the welfare of a child in the first degree, Ms. Fuelling argues that the trial court could not convict her of felony murder in this case.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In March 2001, Mr. Mendoza married Ms. Fuelling. While babysitting Ms. Fuelling's twenty-three month old son, Raven, in their home on June 23, 2001, Mr. Mendoza inflicted severe injuries on the toddler, requiring him to be life-flighted from Warrensburg to Children's Mercy Hospital in Kansas City. Upon admission to the hospital, Raven had no neurological function and was on a ventilator. A physical examination revealed several bruises of different ages and a "boggy soft area" on the back of his scalp that was about two inches long. A CT scan revealed a very severe brain injury, with severe swelling and blood over the surface of the brain. An eye exam revealed retinal hemorrhages throughout both eyes.

Raven's doctors concluded that these injuries could not have been caused by an accident, such as a fall, and that they resulted from "Shaken Impact Syndrome." Raven never recovered and the doctors pronounced him dead on June 25. The forensic pathologist who later performed an autopsy on Raven's body confirmed that Raven had died from head trauma and labeled the death a homicide.

The State subsequently charged Mr. Mendoza with felony child abuse and second-degree murder. *See State v. Mendoza,* 115 S.W.3d 873, 875 (Mo.App. W.D. 2003). A jury convicted Mr. Mendoza of these crimes, and this court affirmed. *See id.* at 874.

After interviewing Ms. Fuelling and other witnesses, law enforcement officials arrested Ms. Fuelling. Although Ms. Fuelling was not at home when Mr. Mendoza injured Raven on June 23, prosecutors nonetheless concluded that she was aware that Mr. Mendoza had been abusing Raven before his death. They charged that from March 27, 2001 through June 23, 2001, she "knowingly acted in a manner that created a substantial risk to the life, body and

---

1. Section 568.045, RSMo 2000. Unless otherwise indicated, all statutory references are to RSMo 2000.

2. Section 565.021(2).

health of Raven ... by leaving [him] in the care of Carlos Mendoza, knowing that said Mendoza abused the child."

Ms. Fuelling waived a jury and the case was tried to the court. At trial, the State called the following witnesses whose testimony was relevant to the question of Ms. Fuelling's knowledge of Mr. Mendoza's treatment of the child.

Anna Schroeder was Ms. Fuelling's friend and a guest in her home for several months before Raven's death. Ms. Schroeder testified that she informed Ms. Fuelling before Raven's death that Mr. Mendoza kept Raven in a back bedroom during the day with the door closed and that Mr. Mendoza would yell at the child, telling him to "shut up, lay down, go to sleep." Ms. Schroeder also testified that she informed Ms. Fuelling about a knot on Raven's head that she observed one day after Raven emerged from the back bedroom where Mr. Mendoza had been watching him. Ms. Schroeder further testified that she had seen Mr. Mendoza grab Raven by the arm in Ms. Fuelling's presence on another occasion "and kind of pull him towards him and yell at him." Mr. Mendoza was "just being real forceful with him" and the crying child only cried harder. According to Ms. Schroeder, Ms. Fuelling told Mr. Mendoza to leave Raven alone, but he sometimes repeated the incidents afterward. Ms. Schroeder further testified that she and Rebecca Perry had confronted Ms. Fuelling about Raven's bruises before his death.

Rebecca Perry was Ms. Fuelling's friend and co-worker. While staying in Ms. Fuelling's home in June 2001, Ms. Perry was present when Ms. Fuelling questioned Mr. Mendoza about a bite mark on Raven's forearm. Mr. Mendoza initially denied biting Raven, but later told Ms. Fuelling that he could have done it "to teach [Raven] not to bite him." Ms. Perry also

remembered that Mr. Mendoza had tried repeatedly to give the child beer and that he had forced the child to go into the water even though the child was frightened of the water and crying. According to Ms. Perry, Ms. Fuelling was present at both of these incidents. Ms. Perry also testified that she and Ms. Schroeder had notified Ms. Fuelling before Raven's death of a comment made by Mr. Mendoza that he did not like Raven.

Jennifer Ridgeway was Raven's paternal aunt. Sometimes she cared for Raven in the months preceding his death. When Raven began to wake up screaming, Jennifer Ridgeway talked to Ms. Fuelling about it. Ms. Fuelling told her that "it was probably because [Raven] expected Carlos to wake him up because she said that Carlos had wakened him up many times from his sleeping and that he was probably just expecting him to wake him up." Ms. Fuelling told Jennifer Ridgeway that Mr. Mendoza would "shake [Raven] awake after a deep sleep, he would just shake him awake and it startled him."

Another time, Jennifer Ridgeway talked to Ms. Fuelling about an unusual bruise that Ms. Ridgeway had seen on Raven's head. Ms. Ridgeway asked Ms. Fuelling about the bruise and Ms. Fuelling told her that "when [Mr. Mendoza] plays with him, he shakes him, rough with him, and that is how it was brought up." Ms. Fuelling told Jennifer Ridgeway that Mr. Mendoza shook the child to aggravate him. She further said that Raven did not like to be shaken and that he would end up crying as a result.

Jennifer Ridgeway told Ms. Fuelling that shaking the child "wasn't right and that it couldn't happen" and that she could not allow it to happen again "because something was going to happen to Raven."

Jennifer Ridgeway also informed Ms. Fuelling that Raven's relatives were going to call the Missouri Division of Family Services if they saw anything else unusual.

Patricia Ridgeway was Raven's paternal grandmother. She saw abnormal bruises on Raven's head too. She claimed that Ms. Fuelling attributed the bruising to Mr. Mendoza's shaking of the child:

Q. Did you have—in 2001, after Michelle married a Carlos Mendoza, did you have occasion to discuss with Raven's mother, Michelle Fuelling, some episodes of shaking that she described to you?

A. Yes, definitely.

Q. And how did it occur that she related to you the first time she talked about Raven being shaken?

A. She told me that Raven was being shooken [sic] by Carlos and that when he had shooken [sic] him, it was to aggravate him and, you know, things like that and just—

Q. How did it come up, the topic come up, that her husband was shaking the baby to aggravate him?

A. Well, Raven had some bruising on his head and we didn't know for sure if this had anything to do with it and we were trying to find out why Raven was getting these bruises and he was being shooken [sic], she said and, you know, this is what caused it and he had them on his forehead, the bruises.

Q. Did she say—did she give you any indication about how often these shaking events occurred?

A. She didn't say how often. There were a couple times, yes, there was.

Q. Did she say what, if anything, she said to her husband when he would do this?

A. She said she was going to talk to him and find out if it was him that was

doing it and see what was—if he was the one that was doing it.

Q. Doing what?

A. Shaking the baby.

Q. Okay. Well, she told you that he was shaking the baby, did she not?

A. Yes, she did.

Patricia Ridgeway also notified Ms. Fuelling that she was going to contact the Department of Social Services "if something wasn't done about it, you know, find out what was going on and [Ms. Fuelling] said she was going to talk to [Mr. Mendoza] and take care of it."

Ms. Fuelling also testified. She remembered that Ms. Schroeder had told her that Mr. Mendoza kept Raven in the back bedroom all day and that Ms. Schroeder heard Mr. Mendoza screaming at Raven and telling him to "shut up." She remembered that Ms. Schroeder had informed her about this happening more than once. She testified that her friends told her that Mr. Mendoza did not like Raven. She acknowledged knowing that Mr. Mendoza had bitten Raven hard enough to leave a noticeable bruise. She also acknowledged seeing bruises on Raven before his death. But she denied ever knowing that Mr. Mendoza was abusing the child. She maintained that she had "suspicions" but nothing more.

At the close of the State's evidence, Ms. Fuelling moved for judgment of acquittal on the ground that the State had failed to establish that she had acted knowingly. The trial court denied the motion. Ms. Fuelling moved for judgment of acquittal at the close of all the evidence on the ground of "lack of sufficient evidence on the—proving the element." The trial court again denied the motion.

The trial court convicted Ms. Fuelling on both counts and sentenced her to five years in prison on the child endangerment

count and ten years in prison on the second-degree murder count, the sentences to run consecutively.

## II. LEGAL ANALYSIS

"A person commits the crime of endangering the welfare of a child in the first degree if: (1) The person knowingly acts in a manner that creates a substantial risk to the life, body, or health of a child less than seventeen years old...." § 568.045.1. The relevant elements of this crime—each of which the State must prove beyond a reasonable doubt—are: "(1) the act itself; (2) the perpetrator of the act; and (3) knowledge." *State v. Gunn*, 57 S.W.3d 347, 351 (Mo.App. W.D.2001). The only element at issue here is knowledge.[3]

"A person 'acts knowingly', or with knowledge, (1) With respect to his conduct or to attendant circumstances when he is aware of the nature of his conduct or that those circumstances exist; or (2) With respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result." § 562.016.3.

To establish knowledge under section 562.016.3(2) in this case, the State had to prove that Ms. Fuelling knew that her conduct was "practically certain to *endanger* the child." *State v. Riggs*, 2 S.W.3d 867, 873 (Mo.App. W.D.1999). And the State had to prove that Ms. Fuelling had actual knowledge of this fact. *See State v. Nations*, 676 S.W.2d 282, 284–85 (Mo.App. E.D.1984). It was not enough for the State to prove that Ms. Fuelling willfully blinded herself to the truth. *Id.* at 285. The State could rely upon either direct or circumstantial evidence to establish this

element of its case against Ms. Fuelling. *State v. Gaver*, 944 S.W.2d 273, 277 (Mo. App. S.D.1997).

### A. Ms. Fuelling Has Not Rebutted the Presumption that the Trial Court Followed the Law

■ Ms. Fuelling first argues that the trial court erroneously declared and applied the law when it denied her motion for judgment of acquittal at the close of the State's case and said:

> The Court is more persuaded by the case of *State versus Gaver*, G–A–V–E–R, 944 S.W.2d 273, Southern District, Court of Appeals, 1997. *In that case, a mother was charged with first degree endangerment based upon conduct of her husband and leaving the children in the husband's care after she had had facts that would be sufficient for a reasonable person to know that abuse was going on.* And as the Court of Appeals noted, direct proof of the required mental state knowingly is seldom available in such intent. It's usually inferred from the circumstantial evidence, mental elements establishing that a defendant knowingly did an act may be proved by indirect evidence and inferences reasonably drawn from circumstances surrounding the incident. The Court in that case affirmed the conviction of an individual in the element of knowingly based upon the statutory definition.

> Therefore, the Court will deny the Motion for Judgment of Acquittal at the close of the State's case and find that the State has made a submissible case

---

**3.** Because Ms. Fuelling argues only that she did not act "knowingly," she evidently does not dispute that leaving Raven in Mr. Mendoza's care created a substantial risk to Raven's life, body, and/or health. *Cf. Carmons v. State*, 26 S.W.3d 382, 385–86 (Mo.App. W.D.

2000) (no factual basis for guilty plea existed where record failed to establish what defendant knowingly did to present substantial risk to child, as opposed to establishing just the potential for risk or danger).

on each and every element of the offense charged.

(emphasis added).

Ms. Fuelling argues that the court's statement shows that the court departed from the correct "actual knowledge" standard and applied an incorrect "reasonable person" standard instead.

As Ms. Fuelling acknowledges, this court " 'presumes that the trial judge knew and *followed* the law.' " *Haddock v. State,* 75 S.W.3d 872, 877 (Mo.App. W.D.2002) (quoting *State v. Roll,* 942 S.W.2d 370, 374 (Mo. banc 1997)). Ms. Fuelling has not overcome that presumption here. *See id.* ("The appellant alleges nothing in his motion nor points us on appeal to anything in the record that would rebut the presumption that the trial court here knew and applied the law in convicting him."). Although the trial court summarized the holding in *Gaver* incorrectly, it does not appear that the court applied anything other than the correct "actual knowledge" standard. Before the trial court announced its verdict, it again addressed this element of the case and said:

> Secondly, there was arguments regarding the issue of knowingly and the Court, even though there were some arguments made about what a reasonable person would know and, certainly, that may play into some of the case law as to indirect or circumstantial evidence, this Court must be guided by 562.163[sic], which is the statute that pertains to whether a person acts knowingly or not. And that provides that with respect to his conduct or intended circumstances when he or she is aware of the nature of his or her conduct and that those circumstances exist or with respect to the result of his or her conduct when he or she is aware that his or her conduct is practically certain to cause that result. The Court is guid-

> ed—and I want to make this very clear, the Court is guided by the statutory definition of knowingly as it results in this case and is applied in this case, and that the Court's verdict in this matter is based upon what the Court believes, based upon the credible evidence beyond a reasonable doubt, was the Defendant's knowledge on the day and time that the Information charges.

Thus, even if the trial court initially summarized the holding in *Gaver* incorrectly, its subsequent comments make clear that the court ultimately announced and applied the correct statutory definition.

## B. The State Presented Sufficient Evidence to Show that Ms. Fuelling Had the Requisite Knowledge

■ Ms. Fuelling also argues that the State presented insufficient evidence to establish the knowledge element of the crime. When reviewing a challenge to the sufficiency of the evidence, this court accepts as true all of the evidence favorable to the State, including all favorable inferences drawn from the evidence. *State v. Winsor,* 110 S.W.3d 882, 885 (Mo.App. W.D.2003). This court disregards all evidence and inferences to the contrary. *Id.* This court only determines whether there was "sufficient evidence from which the court might have found the defendant guilty beyond a reasonable doubt." *State v. Sellmeyer,* 108 S.W.3d 780, 781 (Mo. App. W.D.2003). This court does not determine the credibility of witnesses. *Id.*

Viewed in the light most favorable to the State, the evidence in this case establishes the requisite mental element of the crime. The State presented direct evidence of Ms. Fuelling's knowledge that her conduct was "practically certain to *endanger* the child." *Riggs,* 2 S.W.3d at 873. According to several family members and friends—includ-

ing Rebecca Perry, Jennifer Ridgeway, and Patricia Ridgeway—Ms. Fuelling knew that Mr. Mendoza had shaken Raven on more than one occasion in the two months leading up to his death. And she knew before Raven's death that shaking a child was inappropriate and dangerous behavior. She knew that Mr. Mendoza had bitten Raven. She knew that Raven had suffered large, unusual bruises, one of which she apparently had attributed to Mr. Mendoza's shaking of the child.

The State also presented circumstantial evidence of such knowledge. Actual knowledge can be inferred from the circumstances where the State presents evidence of obvious, observable injuries coupled with evidence that the parent was put on notice about abuse at the hands of her spouse. *See Gaver,* 944 S.W.2d at 277–78 (affirming jury verdict convicting mother of four counts of first-degree endangering the welfare of a child and holding that the State presented sufficient evidence of mother's knowledge that father was abus-

ing their children where doctor had notified mother that children's injuries were not accidental and children suffered multiple, observable injuries).

Ms. Fuelling knew that Mr. Mendoza did not like Raven. She knew that Raven had suffered unusual and unexplained bruises on his face and buttocks. She knew that these injuries occurred while Mr. Mendoza was supposed to be caring for Raven. She knew that Mr. Mendoza liked to antagonize Raven by shaking him, tormenting him with a scary mask, and placing him in water. She had also been warned by friends and family members about Mr. Mendoza's treatment of Raven, and some of these people had threatened to report the matter to DFS.

Given the direct and circumstantial evidence presented in this case, there was sufficient evidence for the trial court to conclude that Ms. Fuelling actually knew that her conduct in leaving Raven with Mr. Mendoza was "practically certain" to endanger the child.[4]

---

4. Our conclusion in this case does not conflict with our recent decision in *State v. Burrell,* WD62062, —— S.W.3d ——, 2004 WL 1440393 (June 29, 2004), where we reversed the first degree child endangerment conviction, along with the felony murder conviction, of a mother who either allowed or acquiesced to her child having contact with his father, who had previously beaten and kicked the child. *Burrell* is readily distinguishable by virtue of the charging documents utilized in that case.

Our opinion in *Burrell* hinged largely upon the narrowly focused language employed by the State in charging Burrell. In that case, the State charged the defendant with, on a specific date, "placing the child, I.W., in direct contact with Isaiah Washington who defendant ha[d] previously seen physically abuse I.W. and by so doing, defendant allowed the child to be assaulted by Isaiah Washington." Accordingly, the information dealt solely with the defendant's actions on the date in question and the fact that the child was allowed to have contact with his father on that date.

The information in the case at bar charged Fuelling with first degree child endangerment in the following manner:

The Prosecuting Attorney of the County of Johnson, State of Missouri, charges that the defendant, in violation of Section 568.045 RSMo, committed the class D felony of endangering the welfare of a child in the first degree, punishable upon conviction under Sections 558.011 and 560.011 RSMo, in that from March 27, 2001, through June 23, 2001, in the County of Johnson, State of Missouri, the defendant knowingly acted in a manner that created a substantial risk to the life, body and health of Raven Ridgeway, a child less than seventeen years old, by leaving Raven Ridgeway in the care of Carlos Luna Mendoza, knowing that said Mendoza abused the child.

Under the language of this information, Fuelling was charged with repeatedly leaving the child alone with a known abuser over a period of three months. Thus, the State needed to prove that the defendant knew that repeatedly leaving the child alone with Mendoza over a period of three months was prac-

The judgment of the trial court is affirmed.

JOSEPH M. ELLIS, C.J., and PATRICIA BRECKENRIDGE, JJ. concur.

tically certain to result in injury to the life, body, or health of the child at some point during that period.

In contrast, in *Burrell* the State was required to prove that the child was practically certain to sustain injury on the day referenced in the information by virtue of the "contact" with the father. In that case, unlike the instant appeal, the State failed to prove the charge as drawn.