**STATE of Missouri, Plaintiff– Respondent,**

v.

**Jason D. OSBORN, Defendant– Appellant.**

**No. SD 29677.**

Missouri Court of Appeals, Southern District, Division Two.

May 14, 2010.

Motion for Rehearing and Transfer Denied May 27, 2010.

Motion for Rehearing and Transfer Denied June 4, 2010.

Application for Transfer Denied Aug. 31, 2010.

Craig A. Johnston, Columbia, MO, for Appellant.

Chris Koster, Attorney General and Daniel N. McPherson, Assistant Attorney General, Jefferson City, MO, for Respondent.

GARY W. LYNCH, Presiding Judge.

Jason D. Osborn ("Defendant") appeals the trial court's judgment convicting him of three counts of endangering the welfare of a child, pursuant to section 568.045,[1] one count of enticement of a child, pursuant to section 566.151,[2] and two counts of felony murder in the second degree, pursuant to section 565.021.[3] Defendant claims that he was erroneously denied his right to self-representation and that the trial court erred in overruling his motion for judgment of acquittal at the close of all evidence for insufficiency of the evidence as to each count. We affirm in part and reverse in part.

### Factual and Procedural Background

We view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the trial court's judgment and disregard all contrary evidence and inferences. *State v. Power*, 281 S.W.3d 843, 845 (Mo.App.2009). In that light, the following was adduced at trial.

During the relevant time period, May 2003 to August 2003, Defendant was thirty-six years old and an employee at the Beachhouse Café in Rockaway Beach. He is the first cousin of the stepfather of J.S., one of the victims in this case. That spring, J.S. introduced three of his

---

1. All references to section 568.045 are to RSMo Cum.Supp.2003.

2. All references to section 566.151 are to RSMo Cum.Supp.2002.

3. All references to section 565.021 are to RSMo 2000.

friends—B.B., J.M., and D.R., all of whom are also victims in this case—to Defendant. In May 2003, all four boys were either fourteen or about to turn fourteen.

The first night the boys met Defendant, he asked them to help him clean up at the restaurant; the group cleaned the counters, took out the trash, and crushed some boxes. While in the basement crushing boxes, Defendant "made some pretty vulgar statements" and "kind of spooked" the boys. B.B., in particular, thought that Defendant was "weird" and "perverted." Yet the group of boys hung around Defendant fairly often that summer, primarily because Defendant bought the boys alcohol, "horny goat weed pills," and cigarettes. Defendant never imbibed himself, however, and told the boys that he was a preacher. In that regard, Defendant referenced Bible verses that he claimed said "it was okay to be gay or something like that."

Early in the summer, B.B.'s older brother caught Defendant buying the boys beer. B.B.'s brother and a friend physically pushed Defendant and told him to stay away from the boys, and Defendant "disappeared" for a few weeks. Defendant then resumed hanging around the boys and buying them alcohol.

While hanging out with Defendant, the boys would skateboard and play basketball; Defendant never participated in those activities but would simply watch the boys. Although when in public Defendant would babble and effect a "nervous twitch," when it was only Defendant and the four boys, Defendant "wasn't slow[,]" and acted "highly intelligent."

At some point that summer, B.B. was alone with Defendant, who had offered to drive B.B. to Galena, Missouri, to visit a friend. On the way there, Defendant pulled over at a construction site and offered B.B. "a quantity of money," somewhere between $150.00 and $200.00, to give B.B. oral sex. B.B. responded that he wanted to leave and that he was "just really scared." After sitting at the site for ten minutes or so and asking at least once more that he be allowed to give B.B. oral sex, Defendant drove the two of them away from the construction site. The trip then continued as planned.

Also that summer, Defendant asked B.B. and J.M. to take a picture of them with their shirts off, in exchange for a carton of cigarettes. The boys refused to cooperate.

On four or five occasions that summer, Defendant let the boys drive a car. While one of the boys drove, Defendant sat in the front passenger seat of the vehicle, and would "try to grab [the driver's] legs" and "lean over and try to kiss [the driver.]" The boys would always push Defendant away. When one of the boys was driving, the other boys would sit on the window sills of the car, with their upper bodies outside of the vehicle. Occasionally, other individuals would be hanging around with Defendant, too, but usually it was just Defendant and the four boys. Sometimes, while a boy was driving the vehicle, Defendant would, without explanation or apparent reason, jerk the steering wheel, causing the car to go sideways.

On August 11, 2003, B.B., J.M., and J.S. were hanging out at J.S.'s house in Rockaway Beach. D.R. had just come to visit when Defendant pulled up in his fiancée's car and asked the boys to come help him deliver some boxes. Once the boxes had been delivered, Defendant drove the group to Blansit Road, a one-lane, winding dirt road in Taney County. Once at Blansit Road, Defendant pulled off to the side near a bridge and asked the boys if they wanted to drive. At some point that day, all four boys drove the vehicle. During each boy's turn, he would drive the car

straight down Blansit Road and turn around. They never encountered any other cars that day.

While each boy drove, the remaining boys rode either on the hood of the car or on the passenger-side windowsill, with two boys riding on the same windowsill. Defendant never told the boys such activity was dangerous or that they should get down from either location.

When B.B. got behind the wheel for a second time, J.M. was riding on the hood of the car, while J.S. and D.R. were sitting on the passenger windowsill. B.B. drove from the bridge to the end of the road, turned the car around, and began heading back toward the bridge. Defendant told B.B. to "quit driving like a granny." The car was traveling around thirty miles per hour. Defendant reached over and grabbed the steering wheel, jerking it to the side. J.M. slid across the hood and fell off the car, landing in the road. The car ran off the road, and the passenger side of the vehicle hit a tree.

B.B. blacked out on impact. When he came to, he was disoriented. He got out of the car and saw J.M. walking down the road, covered in blood. The two boys walked to a nearby creek to wash J.M.'s wounds. At that point, Defendant got out of the car, grabbed something from the trunk, and told B.B. and J.M. that "he wasn't taking the heat for it." When B.B. asked Defendant if everyone was alright, Defendant replied that "they were dead." Defendant then left the scene, heading away from the highway. B.B. finished splashing water on J.M.'s wounds and then ran toward the highway to a nearby construction site for help. From there, B.B. was taken to a store where he called the police. J.M. walked to a nearby swimming hole, and people who were swimming there gave him a ride back to the crash site.

At some point after the crash, but before help arrived on the accident scene, the car caught fire.

Corporal Mark Green of the Missouri State Highway Patrol was the lead investigator for the accident. He arrived on the accident scene just after 3:00 p.m. and saw the car "fully engulfed in flames." He waited until the fire department extinguished the flames and then approached the vehicle. Once up close, he realized that the bodies of two teenagers were inside. At that point, there were no witnesses or bystanders at the site, so Corporal Green began to piece together what had happened from the accident scene itself. From tire marks, he was able to tell that the car had initially swerved to the right, then to the left, where it partially left the road, and then swerved back to the right, where it left the road completely and hit the tree. From there, the car rotated around and ended up near the creek that bordered Blansit Road. Corporal Green also determined that the car had to be traveling relatively fast, both because of the marks left by the vehicle and because the car had ricocheted off of the tree and across to the creek on the other side of the road.

While Corporal Green was investigating the scene, J.M. returned to the site of the crash. J.M. told Corporal Green what had happened and was taken by ambulance to the hospital. Shortly thereafter, B.B. returned to the scene with his mother and also related to Corporal Green the events leading up to the accident.

It was later determined that, after leaving the scene of the accident, Defendant eventually went to a nearby residence, arriving there some two hours after the crash. The homeowner transported Defendant to Skaggs Hospital. Following his investigation at the accident scene, Corporal Green went to Skaggs to see Defen-

dant. At that point, when asked what had happened, Defendant stated that all he remembered was "waking up in the woods."

The following day, Corporal Green arrested Defendant at his fiancée's house. Corporal Green read Defendant his *Miranda*[4] rights and again asked Defendant what had happened. Defendant again stated that the only thing he remembered was waking up in the woods.

Right after Defendant was released from the hospital, however, Defendant told his fiancée that he and the boys were at a park picking up trash when two of the boys got out of the car, "cold-cocked [Defendant] over the head and [threw him] in the passenger seat of the car[.]" One boy then took the wheel while the other one jumped on the hood of the car and then they crashed.

Following autopsies and examination by a forensic pathologist, the coroner determined that D.R. and J.S.—the two boys who were seated on the passenger windowsill at the time of the crash—both died as a result of blunt trauma injuries to the chest, neck, and head. Although the boys' bodies sustained serious burns as a result of the car catching fire after the crash—one boy was so badly burned that he was only identified by his wristwatch—the coroner determined that the boys were already dead when the fire erupted. The two deaths were officially ruled to be homicides.

Defendant was charged with three counts of endangering the welfare of a child in the first degree, pursuant to section 568.045, one count each for J.M., J.S. and D.R.; two counts of enticement of a child, pursuant to section 566.151, one count each for J.M. and B.B.; and two counts of murder in the second degree, pursuant to section 565.021, one count each for J.S. and D.R.[5]

On May 30, 2006, Defendant filed a "request to proceed as pro se." Thereafter, the trial court twice found Defendant incompetent to stand trial, first on November 29, 2006, and again on November 9, 2007. Both determinations were made following competency hearings, the first of which took place on October 16, 2006, and the second on November 2, 2007.

On August 18, 2008, the State filed a motion to proceed. Following a hearing on September 4, 2008, the trial court found Defendant competent to stand trial and set the case for trial the following January.

After a bench trial on January 20 and 21, 2009, at which Defendant was represented by counsel, the trial court found Defendant guilty of all three counts of first-degree child endangerment; one count of enticement of a child, with regard to B.B.; and both counts of felony murder in the second degree. The trial court acquitted Defendant of the enticement-of-a-child charge with respect to J.M. The trial court sentenced Defendant to five years' imprisonment for each count of child endangerment, five years' imprisonment for the enticement of a child count, and fifteen years' imprisonment for each count of felony murder in the second degree. The trial court specified that the five-year sentences were to run consecutively to the fifteen-year sentences.

This appeal timely followed.

### *Discussion*

Defendant raises three points on appeal. We address them in the order presented.

---

4. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

5. On Defendant's motion, venue was moved from Taney County to Wright County.

### Right to Self–Representation

In his first point, Defendant contends that

> [t]he trial court clearly erred in not granting [Defendant's] requests to represent himself without the court's determining whether [Defendant] was knowingly and intelligently waiving his right to counsel, because this deprived [Defendant] of his right to conduct his own defense and to represent himself at trial, as guaranteed by the 6th and 14th Amendments to the United States Constitution and Article I, Section 18(a) of the Missouri Constitution, in that [Defendant] filed an unequivocal, timely request to go *pro se*, and evidence was adduced from [Defendant] and other witnesses that [Defendant] wanted to represent himself, but the trial court failed to have a hearing on the record concerning [Defendant's] assertion of his constitutional right to represent himself and never ruled on [Defendant's] unequivocal request.

We disagree.

A defendant has a constitutional right to represent himself, a right that is "necessarily implied by the structure of the [Sixth] Amendment." *Faretta v. California*, 422 U.S. 806, 819, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). This federal right is extended to defendants charged in state courts through the Fourteenth Amendment. *State v. Gilmore*, 697 S.W.2d 172, 174 (Mo. banc 1985). The right to represent one's self is not, however, absolute. *State v. Parker*, 890 S.W.2d 312, 315 (Mo. App.1994). " '[T]he right of self-representation is a qualified right and its exercise is subject to reasonable restrictions designed to further two important considerations: protection of other fundamental rights guaranteed the accused by the Constitution, and protection of the orderly administration of the judicial process.' " *Id.* at

315–16 (quoting *State v. Sheppard*, 172 W.Va. 656, 310 S.E.2d 173, 187 (1983)). Thus, the exercise of one's right to self-representation "is conditioned on a knowing and intelligent waiver of the right to counsel." *Parker*, 890 S.W.2d at 316 (citing *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). In deciding whether a waiver of counsel has been made knowingly and intelligently—a decision resting soundly within the discretion of the trial court—"a determination must be made as to whether the defendant is mentally competent to understand the ramifications of a waiver." *State v. Blackmon*, 664 S.W.2d 644, 648 (Mo.App.1984) (citing *State v. Nicolosi*, 588 S.W.2d 152, 156 (Mo.App.1979)). Finally, the right to self-representation must be asserted before trial, and the assertion must be both unequivocal and clear. *State v. Wilson*, 750 S.W.2d 560, 564 (Mo.App.1988).

In the instant case, Defendant filed a request to proceed *pro se* on May 30, 2006. On October 16, 2006, the trial court held the first of three competency hearings. At that hearing, Defendant orally reiterated his desire to represent himself:

> Q. Do you disagree with the doctor's opinion that you are not competent to stand trial right now?
>
> A. I have no problem over that, I could care less, I just want to be my own attorney.

These are the only assertions by Defendant of his right to self-representation in the record before us.

While a defendant may be mentally competent to stand trial, but not competent to self-represent, *see Indiana v. Edwards*, 554 U.S. 164, 128 S.Ct. 2379, 2386, 171 L.Ed.2d 345 (2008); *State v. Baumruk*, 280 S.W.3d 600, 610 (Mo. banc 2009), Defendant here has failed to cite us to any authority for his implied converse argu-

ment that a defendant who is not mentally competent to stand trial may, nevertheless, be mentally competent to self-represent. Contrary to Defendant's position, *Edwards* treats mental competency to stand trial as a threshold issue to consideration of a defendant's mental competency to self-represent at trial. *See Edwards*, 128 S.Ct. at 2385–87.

According to the Court in *Edwards*:

The two cases that set forth the Constitution's "mental competence" standard, *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (*per curiam*), and *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), specify that the Constitution does not permit trial of an individual who lacks "mental competency." *Dusky* defines the competency standard as including both (1) "whether" the defendant has "a rational as well as factual understanding of the proceedings against him" and (2) whether the defendant "has sufficient present ability *to consult with his lawyer* with a reasonable degree of rational understanding." 362 U.S. at 402, 80 S.Ct. 788 (emphasis added; internal quotation marks omitted). *Drope* repeats that standard, stating that it "has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, *to consult with counsel, and to assist in preparing his defense* may not be subjected to a trial." 420 U.S., at 171, 95 S.Ct. 896 (emphasis added).

*Id.* at 2383. This standard is juxtaposed by the *Edwards* Court to the "constitutional right to proceed *without* counsel when" a criminal defendant "voluntarily and intelligently elects to do so" as announced in *Faretta. Edwards*, 128 S.Ct. at 2383.

■ The *Edwards* Court referred to the latter as being "the higher standard at

issue here" and referred to Edwards as a "gray-area defendant," describing a defendant in an area demarcated on one side by having the mental competence to stand trial, and on the other side by having the mental competence to self-represent at trial. *Id.* at 2385. The Supreme Court further noted that a defendant having the mental competency to stand trial can by definition assist counsel at trial, "yet at the same time he may be unable to carry out the basic tasks needed to present his own defense without the help of counsel." *Id.* at 2386. The Court later referenced this dichotomy as "the defendant's ability to play the *significantly expanded role* required for self-representation even if he can play the *lesser role* of represented defendant." *Id.* at 2387 (emphasis added). Finally, as relevant here, the Court observed the following:

An *amicus* brief reports one psychiatrist's reaction to having observed a patient (a patient who had satisfied *Dusky*) try to conduct his own defense: "[H]ow in the world can our legal system allow an insane man to defend himself?" Brief for Ohio et al. as *Amici Curiae* 24 (internal quotation marks omitted). See *Massey [v. Moore]*, 348 U.S. [105] at 108, 75 S.Ct. 145, 99 L.Ed. 135 [(1954)] ("No trial can be fair that leaves the defense to a man who is insane, unaided by counsel, and who by reason of his mental condition stands helpless and alone before the court"). The application of *Dusky's* basic mental competence standard can help in part to avoid this result. But given the different capacities needed to proceed to trial without counsel, there is little reason to believe that *Dusky* alone is sufficient.

*Id.* Consistent with the analysis in *Edwards*, we conclude that a trial court's finding that a defendant is not mentally competent to stand trial in accordance with

the basic *Dusky* standard subsumes the issue of the defendant's mental competency to knowingly and intelligently self-represent and precludes an affirmative finding on that issue.

In its ruling on November 29, 2006, the trial court found "that Defendant lack[ed] mental fitness to proceed, in that, as a result of mental disease or defect, he lacks the capacity to understand the proceedings against him or to assist in his own defense." This finding has not been challenged by Defendant in this appeal. Contrary to Defendant's contention otherwise and for the reasons discussed previously, this finding also implicitly includes a determination that Defendant lacks the mental competency to knowingly and intelligently self-represent.

Defendant argues that even though the trial court held a hearing on his mental competence and found him mentally incompetent to stand trial at that time, it was, nevertheless, required to conduct a separate hearing specifically directed toward determining whether Defendant was able to execute an intelligent and voluntary waiver of counsel. In support of this contention, Defendant cites us to *Rodriguez v. State*, 982 So.2d 1272 (Fla.App. 2008). Defendant, however, misreads the nature of the *Rodriguez* ruling and its application to the instant case. In *Rodriguez*, the defendant made an oral statement in court the morning his trial was set to begin that "[he would] prefer to represent [him]self." *Id.* at 1273. The trial court simply denied his "request" without adducing any relevant information from the defendant. *Id.* The Florida Third District Court of Appeal held the trial court in error for failing to conduct a "Faretta inquiry" to determine the defendant's ability to "knowingly and intelligently waive[ ] his constitutional right." *Rodriguez*, 982 So.2d at 1274.

Unlike in *Rodriguez*, here the Defendant's request to proceed pro se was filed with the court well in advance of any courtroom proceedings, and after the motion was filed the trial court conducted a competency hearing, which inquired into the mental status of Defendant, including his mental competency to knowingly and intelligently self-represent. We have found no authority, and Defendant has cited us to none, mandating a separate, distinct hearing be held strictly to ascertain if a defendant is mentally capable of waiving his right to the assistance of counsel at a time when the court also has before it the issue of a defendant's mental incompetency to stand trial and decides that issue adversely to a defendant. Moreover, even if the ruling in *Rodriguez* was binding on this Court, rather than merely persuasive, the competency hearing held on October 16, 2006, for the reasons discussed previously, was an adequate inquiry into Defendant's mental competency to waive his right to counsel and satisfied the hearing requirement in *Rodriguez*.

Defendant's two requests to proceed *pro se* were appropriately subsumed in and denied by the trial court's November 29, 2006, commitment order finding that Defendant was mentally incompetent to stand trial. After Defendant was later found competent to stand trial on September 4, 2008, he did not make any request to self-represent or for reconsideration of his previous requests to proceed *pro se*. Without such action, the trial court properly proceeded under the assumption that Defendant either acquiesced with the trial court's previous determination that he was mentally incompetent to stand trial and, thus, lacked the mental competence to self-represent, or after becoming mentally competent to stand trial, Defendant knowingly and intelligently decided to proceed

**712**

with the assistance of counsel. Defendant's first point is denied.

### Sufficient Evidence that Defendant Knew Victims were Under Seventeen

■ In his second point, Defendant contends that the trial court erred in overruling his motion for acquittal at the close of all the evidence because the State did not present sufficient evidence to demonstrate that Defendant knew J.M., J.S., and D.R. were under the age of seventeen, which is one of the elements of endangerment of the welfare of a child in the first degree. Thus, Defendant argues that his three convictions of first-degree child endangerment should be reversed. Furthermore, Defendant asserts that, if his three convictions for first-degree child endangerment are overturned, his two convictions of felony second-degree murder as to J.S. and D.R. must also be reversed, as those two convictions were premised on the underlying felony of child endangerment. We disagree.

"In reviewing a challenge to sufficiency of the evidence, this Court must determine whether there is sufficient evidence from which a reasonable juror could have found the defendant guilty beyond a reasonable doubt." *State v. Whalen*, 49 S.W.3d 181, 184 (Mo. banc 2001). "The standard of review in a bench-tried case is the same as in a jury-tried case." *State v. Burse*, 231 S.W.3d 247, 251 (Mo.App.2007). We accept as true any and all evidence and inferences supporting the trial court's decision and reject all evidence and inferences to the contrary. *State v. Hall*, 201 S.W.3d 599, 602 (Mo.App.2006). We will affirm the trial court's judgment if any substantial evidence supports the trial court's findings. *State v. Adams*, 163 S.W.3d 35, 36–37 (Mo.App.2005).

■ Section 568.045 provides that "[a] person commits the crime of endangering the welfare of a child in the first degree if ... [t]he person knowingly acts in a manner that creates a substantial risk to the life, body, or health of a child less than seventeen years old[.]" Section 568.045.1(1). There are, thus, four elements the State must prove in order to convict a defendant of first-degree child endangerment: "(1) the defendant engaged in conduct, (2) in so doing, the defendant created a substantial risk to the life, body, or health of a child, (3) the victim was less than seventeen years old, and (4) the defendant acted knowingly with respect to the facts and circumstances." *State v. Short*, 186 S.W.3d 828, 830–31 (Mo.App.2006). This means that a defendant must actually be aware that the child involved is under the age of seventeen. *See State v. Hopkins*, 873 S.W.2d 911, 912 (Mo.App.1994) (requiring a showing that the defendant knew the victim was under seventeen for second-degree child endangerment). As it is difficult to acquire direct evidence of the requisite state-of-mind of a defendant, it is permissible to infer a defendant's knowledge of the age of a victim from indirect and circumstantial evidence. *State v. Gaver*, 944 S.W.2d 273, 277 (Mo.App.1997).

The State presented the following evidence at trial relevant to Defendant's knowledge that J.M., J.S., and D.R. were less than seventeen: Defendant was related to J.S.'s step-father; Defendant spent a total of approximately four months interacting with the boys; Defendant purchased alcohol and cigarettes for the boys; Defendant allowed the boys to drive his car in unpopulated areas; and Defendant had an altercation with B.B.'s older brother, during which the brother confronted Defendant about buying the boys alcohol. In addition, the latest school pictures of J.S. and D.R. were both received into evidence without objection.

While this evidence is the basis for the trial court's and this Court's consideration of the totality of the circumstances, we think it is particularly important to note that Defendant allowed the boys to drive in secluded unpopulated places. Such action gives rise to a reasonable inference that Defendant not only knew that the boys did not have driver's licenses, but also, coupled with the significant amount of time he spent with them during that summer, that they were not eligible to get licenses as they were under the age of sixteen. *See* 302.060, RSMo 2000.

Moreover, the appearances of J.S. and D.R. in their latest school pictures, as they would have appeared to Defendant, provided the trial court vital information in drawing an inference as to Defendant's knowledge that they were under the age of seventeen. Yet, these exhibits were not deposited with this Court and made a part of the record in accordance with Rule 30.05 or this Court's special rule 4, which provides, in part, that "[a]n appellant is responsible for ensuring that all exhibits necessary for the determination of any point relied on are deposited or filed with the Court." "Defendant had the duty to 'file a complete record including all evidence necessary to determine all questions presented to this Court for review.'" *State v. Tanner*, 220 S.W.3d 880, 883 (Mo.App. 2007) (quoting *State v. Morin*, 873 S.W.2d 858, 867 (Mo.App.1994)). In the absence of these exhibits in the record, this Court infers that these pictures would be favorable to the trial court's denial of Defendant's motion for judgment of acquittal and unfavorable to Defendant's insufficiency-of-the-evidence argument. *State v. Brumm*, 163 S.W.3d 51, 56 (Mo.App.2005).

From the totality of the above-described circumstantial evidence, the trial court could have reasonably inferred that Defendant knew J.M., J.S., and D.R. were under seventeen years of age. *State v. Nations*, 676 S.W.2d 282 (Mo.App.1984), cited by Defendant, is easily distinguishable in that the defendant in that case had only known the sixteen-year-old victim for less than a day. *Id.* at 285. Likewise, *State v. Hopkins*, 873 S.W.2d 911 (Mo.App.1994), also cited by Defendant, provides Defendant no aid. In *Hopkins*, there was no evidence that the defendant had known the victim for any longer than the day in question nor was there any evidence of victim's appearance on that day. *Id.* at 912. Defendant's second point is denied.

### Insufficient Evidence Presented that Defendant Knew B.B. was Under Fifteen

 In his final point, Defendant claims that the trial court erred in overruling his motion for judgment of acquittal at the close of all the evidence for the count of enticement of a child involving B.B. because the State presented insufficient evidence that Defendant knew B.B. was under fifteen years of age. As such, Defendant argues that his conviction of enticement of a child must be reversed. We agree.

> A person at least twenty-one years of age or older commits the crime of enticement of a child if that person persuades, solicits, coaxes, entices, or lures whether by words, actions or through communication via the Internet or any electronic communication, any person who is less than fifteen years of age for the purpose of engaging in sexual conduct.

Section 566.151.1. Although the statute itself does not contain a requirement that a defendant know that his victim is under the age of fifteen, the State acknowledges and concedes that the approved jury instruction pertinent to this charge provides that, to be found guilty, a defendant must

have (1) known or been aware that the victim was under fifteen, or (2) intended to pursue sexual conduct with a person under fifteen. MAI–CR 3d 320.37. The State does not argue that this instruction inaccurately reflects the elements of this offense.

The State's response to Defendant's claim on this issue is to "incorporate[ ] the relevant portions of that evidence and argument [presented on Point II] into this Point." Its argument on Point II, however, only addresses the issue as to whether Defendant knew that J.M., J.S., and D.R. were under the age of seventeen and does not address how that evidence supports that Defendant knew B.B. was under fifteen years of age or that Defendant intended to engage in sexual conduct with a person under fifteen.

The crux of the State's argument in the preceding point, and that which convinced this Court that Defendant knew the boys were under seventeen years of age, is that Defendant used cigarettes, alcohol, and, most importantly, driving to bribe the boys to spend time with him. Each of these activities has a required minimum age, the lowest of which is sixteen for driving. As discussed in the preceding point, by allowing the boys to drive his car in the manner as previously described, it is reasonable to infer that Defendant knew the boys were under sixteen years of age and thus could not drive on their own. Knowing that the boys could not legally drive has no bearing, however, on whether Defendant knew that B.B. was under *fifteen* years of age.

A review of the record in this case finds it lacking any evidence whatsoever aimed at demonstrating that Defendant knew B.B. was under fifteen, or that Defendant had a general intent to engage in sexual conduct with someone under fifteen. Furthermore, the difference between fourteen and seventeen is much more significant than that between fourteen and fifteen, and both fourteen– and fifteen-year-olds are equally unable to legally drive. Thus, omitting the driving evidence from the circumstantial-evidence analysis as discussed in the preceding point and noting the lack of any evidence of B.B.'s appearance on the date in question, *see Hopkins,* 873 S.W.2d at 912, we conclude that the remaining circumstantial evidence—Defendant was related to J.S.'s step-father; Defendant spent a total of approximately four months interacting with the boys including B.B.; and Defendant had an altercation with B.B.'s older brother, during which the brother confronted Defendant about buying the boys alcohol—is insufficient to support a reasonable inference that Defendant knew that B.B. was under fifteen years of age or that Defendant had an intent to engage in sexual conduct with someone under fifteen. Defendant's third point is granted.

### Decision

The trial court's judgment as to Count V convicting Defendant of enticement of a child is reversed, but in all other respects, the judgment is affirmed.

SCOTT, C.J., and RAHMEYER, J., concur.

### ON MOTION FOR REHEARING OR TRANSFER TO THE SUPREME COURT

PER CURIAM.

In its motion for rehearing or to transfer to the Supreme Court of Missouri, the State argues for the first time that MAI–CR 3d 320.37 does not accurately reflect the elements of the enticement of a child offense, as provided in § 566.151. The

State claims that § 566.020.3[1] shifts the burden of proof on the issue of a defendant's knowledge of a person's age from the State to the defendant as an affirmative defense to be raised by the defendant on an offense under § 566.151. The State's argument assumes, without any explanation or citation to relevant legal authority, that the provisions of § 566.020.3 directed toward the criminality of conduct dependant "upon a child being under seventeen years of age," subsumes the conduct proscribed under § 566.151 related to "any person who is less than fifteen years of age."

While we question the State's assumption, we need not address it because "[r]espondents in motions for rehearing or to transfer will not be heard on afterthoughts nor on propositions or complaints concerning the disposition of original appeals which were not raised or made in their briefs." *State v. Oliver,* 520 S.W.2d 99, 101–02 (Mo.App.1975) (citing *Ackerman v. Globe–Democrat Publishing Co.,* 368 S.W.2d 469, 480(12) (Mo.1963), *cert. denied,* 375 U.S. 949, 84 S.Ct. 353, 11 L.Ed.2d 276 (1963)). The State's motion is denied.

---

1. Section 566.020, RSMo 2000, provides:
 1. Whenever in this chapter the criminality of conduct depends upon a victim's being incapacitated, no crime is committed if the actor reasonably believed that the victim was not incapacitated and reasonably believed that the victim consented to the act. The defendant shall have the burden of injecting the issue of belief as to capacity and consent.
 2. Whenever in this chapter the criminality of conduct depends upon a child being thirteen years of age or younger, it is no defense that the defendant believed the child to be older.
 3. Whenever in this chapter the criminality of conduct depends upon a child being under seventeen years of age, it is an affirmative defense that the defendant reasonably believed that the child was seventeen years of age or older.