AMERICAN FAMILY MUTUAL
INSURANCE COMPANY,
et al., Respondents,

v.

The MISSOURI DEPARTMENT
OF INSURANCE, et al.,
Defendants,

Legal Aid of Western Missouri,
Appellant.

No. WD 64460.

Missouri Court of Appeals,
Western District.

Sept. 6, 2005.

---

Jeffrey L. Williams, Kansas City, MO, for appellant.

Gary L. Mayes, St. Louis, MO, for respondents.

Stephen R. Gleason, Jefferson City, MO, for defendants.

Before JOSEPH M. ELLIS, Presiding Judge, PAUL M. SPINDEN, Judge and VICTOR C. HOWARD, Judge.

JOSEPH M. ELLIS, Judge.

Legal Aid of Western Missouri ("Legal Aid") appeals from a judgment entered in the Circuit Court of Cole County enjoining the Missouri Department of Insurance ("MDI") from releasing to Legal Aid certain statistical information that had been provided to MDI by various insurance companies doing business in the State, including Respondents Shelter Insurance Company, American Family Insurance Company, The Fire Insurance Exchange, and Mid Century Insurance Company. The trial court determined that the information sought by Legal Aid was protected from disclosure under the Sunshine Act by the Uniform Trade Secrets Act and by Article I §§ 10, 26, and 28 of the Missouri Constitution. For the following reasons, the judgment is affirmed.

Pursuant to § 374.405,[1] which was originally enacted in 1978, insurers providing residential insurance in the State of Missouri, like Respondents, are required to report certain information to MDI on a yearly basis. Specifically, Section 374.405 states:

1. The director [of MDI] shall establish statistical bases for the reporting of premium and loss data under policies of homeowners' insurance, dwelling-owners' insurance, renters'

---

1. All statutory references are to RSMo 2000 unless otherwise noted.

or tenants' insurance, or residential fire insurance.

2. Each insurer shall annually report to the director all premium and loss data under policies of homeowners' insurance, dwelling-owners' insurance, renters' or tenants' insurance, or residential fire insurance as the director may require.

3. The director shall have the authority to review and verify the accuracy of the data reported.

In this vein, pursuant to 20 CSR 600–3.100, MDI has required insurers to provide it with written exposure (the number of policies issued), premium written (the amount of premium collected during the reporting year), loss paid counts (the number of claims made against the policies during the reporting year), and losses paid data (the total amount of losses paid on claims for the reporting year) for residential insurance policies. This information is to be broken down by the zip code in which the insureds reside. Over the years, the Director of MDI has issued bulletins assuring insurers that the information provided would be considered confidential and would not be distributed to anyone, except on an aggregate basis.

On March 17, 2003, Legal Aid submitted a request to MDI, pursuant to the Sunshine Law, § 610.010 *et seq.*, and the Public Records Law, § 109.180, asking MDI to produce "statewide market share data and market share data in minority populated zip-codes in the Kansas City MSA" for residential insurance for the reporting year ending December 31, 2000. On April 4, 2003, MDI informed Respondents of Legal Aid's request and advised Respondents that it was considering releasing the zip code level data to Legal Aid and the public. Respondents subsequently informed MDI that they objected to such disclosure. On June 25, 2003, MDI noti-fied Respondents that it intended to provide Legal Aid with the written exposure and written premium components of the zip code data on file for the year 2000 unless it was enjoined from doing so by a court of competent jurisdiction.

On July 16, 2003, Respondents filed a Petition for Declaratory and Injunctive Relief in the Circuit Court of Cole County asking the court to enjoin MDI from disclosing any of the zip code data on file with MDI. That same day, with the consent of the parties, the trial court entered a preliminary injunction enjoining MDI from disclosing the data.

On August 20, 2003, Legal Aid filed its answer to Respondents' petition. On December 15, 2003, MDI filed its answer to the petition.

The parties subsequently submitted the case to the trial court on written briefs, affidavits, exhibits, and discovery materials. On May 10, 2004, the trial court entered its judgment in favor of Respondents. The court found that the written premium component of the zip code data for the year 2000 was a trade secret and that "the Takings Clauses of the federal and state constitutions and the Missouri Uniform Trade Secrets Act prohibit MDI from disclosing the written premium component to Legal Aid." The trial court permanently enjoined MDI from disclosing any of Respondents' zip code data on file with MDI for the year 2000 to Legal Aid or any other member of the public. Legal Aid brings five points on appeal from that judgment.

■ With regard to this Court's standard of review on appeal, Legal Aid asserts that, in addressing its points, we should review the trial court's decision *de novo* because the trial court did not hear any testimony and the case was submitted to the court on the briefs, affidavits, exhib-

its, and discovery materials. Legal Aid contends that, in reviewing the evidence, this court owes no deference to the factual findings made by the trial court and should determine the facts for itself.

■ Our review in a court-tried case is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). *Business Men's Assurance Co. v. Graham*, 984 S.W.2d 501, 505 (Mo. banc 1999). Accordingly, "[t]he decision of the trial court will be affirmed on appeal unless no substantial evidence supports it, it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law." *Brizendine v. Conrad*, 71 S.W.3d 587, 590 (Mo. banc 2002).

■ Contrary to Legal Aid's assertions, "[t]his Court 'defers to the trial court as the finder of fact in determinations as to whether there is substantial evidence to support the judgment and whether that judgment is against the weight of the evidence, even where those facts are derived from pleadings, stipulations, exhibits and depositions.'" *Id.* (quoting *Graham*, 984 S.W.2d at 506). Thus, "[i]n reviewing a contention that the evidence is insufficient, the evidence is viewed in the light most favorable to the verdict, and deference is accorded to the trial court's assessment of credibility." *Id.* Moreover, "[t]he appellate court is primarily concerned with the correctness of the trial court's result, not the route taken by the trial court to reach that result." *Graham*, 984 S.W.2d at 506 (internal quotations omitted). "Thus, the judgment will be affirmed if cognizable under any theory,

regardless of whether the reasons advanced by the trial court are wrong or not sufficient." *Id.* With this standard of review in mind, we turn to Legal Aid's points on appeal.

■ In its first point, Legal Aid contends that the trial court erred in finding that the written premium data for 2000 was a trade secret under the Uniform Trade Secrets Act,[2] thereby rendering the information exempt from disclosure under the Sunshine Act and the Public Records Law.[3]

A "trade secret" is defined as:

information, including but not limited to, technical or nontechnical data, a formula, pattern, compilation, program, device, method, technique, or process that:

(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. .

*Lyn–Flex West, Inc. v. Dieckhaus*, 24 S.W.3d 693, 698 (Mo.App. E.D.1999) (quoting § 417.453(4) ). In determining whether the information involved in a given case constitutes a trade secret under the Uniform Trade Secret Act, the following factors have been utilized by the courts to provide guidance:

(1) the extent to which the information is known outside of [the] business;

---

**2.** Section 417.455 authorizes the courts of this State to grant an injunction to prohibit the misappropriation of a trade secret. "Misappropriation" includes the disclosure of a trade secret without consent where the party seeking to disclose the trade secret knows or has reason to know that the trade secret was

acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. § 417.453(2)(b) and *(c)(ii)*.

**3.** Both statutes allow records to be closed where permitted by law. § 610.021(14) and § 109.180.

(2) the extent to which it is known by employees and others involved in [the] business;

(3) the extent of measures taken by [the business] to guard the secrecy of the information;

(4) the value of the information to [the business] and to [its] competitors;

(5) the amount of effort or money expended by [the business] in developing the information;

(6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* (quoting *AEE–EMF, Inc. v. Passmore*, 906 S.W.2d 714, 721–22 (Mo.App. W.D. 1995)).[4] "The existence of a trade secret is a conclusion of law based on the applicable facts." *Id.*

Legal Aid argues that the Respondents failed to prove that the written premium component derives independent value from not being generally known to or readily ascertainable by other persons who can obtain economic value from its disclosure because "prior release of such data has not afforded any competitive advantage to their competitors, the data is too limited in age and scope to afford such an advantage, and such deminimus [sic] value renders the information subject to disclosure when the interest of the public in disclosure is balanced against the need to protect property interests represented."

Legal Aid makes no assertions related to the first, second, third, fifth, and sixth factors set forth *supra*. Indeed, the record clearly supports a finding that the information sought by Legal Aid was not known outside of the various insurance companies and MDI; that the insurance companies only allowed a limited number of employees to have access to the information; that the insurance companies utilized extensive measures to guard the secrecy of the information; that the companies spent significant effort and money in developing the information at issue; and that it would be difficult for a competitor to obtain the specific data at issue on its own.

Legal Aid's challenge on appeal focuses solely on the trial court's finding that the information at issue had independent economic value, actual or potential, to the insurance companies and their competitors. Despite the fact that this is only one of the factors considered by the courts in determining whether the information at issue is a trade secret, it is a factor required under the statute, and a business seeking to protect information as a trade secret must prove that it has some independent economic value, actual or potential, in order for the information to qualify as a trade secret under the statutory definition. *See § 417.453(4)(a).* Thus, the issue before us is whether the trial court's finding that the requested information had independent economic value is supported by the evidence and is not against the weight of the evidence.

Respondents presented affidavits executed by Michael Miller, an actuarial consultant, in support of their claim that information related to the written premiums obtained by each insurer in each zip code had economic value. Miller stated that all

---

4. These factors are borrowed from the *Restatement (First) of Torts § 757. Lyn–Flex West, Inc. v. Dieckhaus*, 24 S.W.3d 693, 698 (Mo.App. E.D.1999). "Although the Restatement's factors are not part of the Uniform Trade Secrets Act, the act essentially incorporates these factors in its definition of trade secrets." *Id.* "Further, courts in states that have adopted the Act, have found that those factors provide guidance in determining whether the information in a given case constitutes trade secrets within the definition of the Act." *Id.*

four of the types of information collected by MDI, and combinations thereof, provided important information about each specific insurer's pricing and/or marketing strategies in the State. He stated that written premiums by zip code, even without the accompanying exposure counts, can be an important indicator of where an insurer has been successful in marketing its policies. He indicated that there was no public source of information for determining the volume of premium dollars written in a specific zip code and that information concerning where a competitor's policies are could be extremely valuable in setting the rates to be charged. Miller also said that premium volume by zip code revealed important information about where an insurer's customers are located and where the insurer has been successful in its marketing strategy. He further indicated that knowledge of where a competitor was not writing any insurance, or not writing much insurance, was just as valuable competitive information as knowing where sales were being emphasized. Miller stated that "[b]y having access to other insurers' company-specific premium data by zip code, an insurer could determine which other insurers actually compete within any particular zip code, adjust its rates as it deems necessary in relation to the filed rates of its actual competitors in that particular zip code, and disregard the filed rates of those other insurers that do not compete with the insurer in that particular zip code." Miller stated that the competitive value of the written premium information by zip code extended for a minimum of five years and might have value for up to ten years. He further indicated that many insurers have marketing strategies that target geographic areas within the state and that disclosure of company-specific premium data by zip code would reveal those marketing strategies to competitors and provide information on how successful the insurer had been in marketing its products in each zip code.

The insurers also presented affidavits from actuaries from each of the various insurance companies. Those affidavits state that the written premium component of the zip code data reflects where their customers are located, the amount of business the insurer has in the zip code, and how successful or unsuccessful the insurer has been in each zip code. The affidavits assert that, if competing insurers were to obtain this information, they could adjust their pricing to become more competitive and/or more profitable in a given zip code and might adopt similar marketing strategies to those utilized by the more successful insurers in the zip code.

In short, Respondents' experts testified that the zip code level written premium data was potentially valuable to competitors, and they explained how competitors might be able to use that information to their economic advantage. This testimony sufficiently supports a finding that the zip code level written premium data "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use." § 417.453(4)(a).

Legal Aid's argument on appeal, however, implicitly challenges the trial court's finding as being against the weight of the evidence. Boiled down to its essence, Legal Aid's contention is that its experts offered evidence that supports a result contrary to that reached by the trial court and that this court should find in favor of Legal Aid in reviewing the case *de novo*. As previously noted, however, we are not reviewing the trial court's judgment *de novo*. We must view the evidence in the light most favorable to the judgment and

defer to the trial court's assessment of the credibility of the experts. *Brizendine*, 71 S.W.3d at 590. The judgment is to be affirmed if it is supported by the evidence, is not against the weight of the evidence, and does not erroneously declare or apply the law. *Id.* Applying the proper standard of review, we view Legal Aid's point and argument as asserting that the judgment is not supported by the evidence and is against the weight of the evidence.

Legal Aid extensively discusses the affidavits of its own experts and contends that their affidavits refute the claims of the insurers' experts and demonstrate that the opinions of the insurers' experts are based upon speculation. As noted *supra,* Legal Aid argues that the Respondents failed to prove that the written premium component has independent economic value because (1) "prior release of such data has not afforded any competitive advantage to their competitors," (2) "the data is too limited in age and scope to afford such an advantage," and (3) "such deminimus [sic] value renders the information subject to disclosure when the interest of the public in disclosure is balanced against the need to protect property interests represented."

Legal Aid points to testimony offered by two of its experts indicating that information similar to the data at issue in this case had been previously released in a handful of other states. The experts further testified that they were not aware of any evidence indicating that this disclosure had caused any detriment to the insurers involved or any competitive advantage to their competitors. Legal Aid contends that, because the insurers failed to demonstrate any harm had occurred from the release of data in these other states, the trial court could not have properly found the potential for harm in the release of the data in this State.

Legal Aid relies upon the testimony by its experts that they are not aware of any evidence that the release of similar data in a handful of other states [5] caused any harm to the insurers operating within those states. One of the experts also cited an example of one insurer in Texas whose zip code level data was released to the public as a result of a civil case and managed to subsequently increase its statewide market share. The expert asserted that this was "powerful evidence refuting the companies' claim of competitive harm from the release of their zip code data." Legal Aid asserts that Respondents' failure to present evidence of any economic damage to insurers in the states that have released such data refutes any contention that the data has economic value.

The statements offered by Legal Aid's experts fail to conclusively establish that insurance companies were not harmed by the release of this data in the other states referenced. The fact that the experts are not aware of any harm does not establish that none existed. Further, even if the amount of premium collected by an insurer did not decrease, or even increased, after the release of such data, that does not establish a lack of harm to the company's business as the release of the data may have reduced the rate of growth for the insurer. Moreover, even if no harm occurred from the release of data in those states, the fact that insurers were not harmed in those instances does not conclusively discredit the testimony of Respondent's experts that the potential for harm exists. While we might have viewed this evidence more favorably and given it

---

**5.** The experts testified that similar data has been released in Massachusetts, Illinois, and Minnesota.

greater weight than did the trial court, the mere presence of the evidence in the record does not render the trial court's judgment against the weight of the evidence.

Legal Aid also asserts that the age and the limited scope of the data requested refuted any claims that the data has independent economic value. At the time of trial, the data was three years old. Legal Aid notes that its two experts opined that the data was of little value to competitors of the insurance companies due to the age of the data and the fact that intervening events had occurred that might have affected the companies' rate making and marketing strategies. Respondents' experts, on the other hand, stated that the data had value for at least five years, that the insurance companies still utilized that data in their own rate making, and that the data would still provide competitors with useful information that they could utilize to the detriment of the reporting company. Pursuant to our standard of review, we must defer to the trial court's assessment of the credibility of the witnesses and the weight to be given their testimony. *Brizendine*, 71 S.W.3d at 590. Viewing the evidence in this manner, the affidavits of Respondent's experts sufficiently support the trial court's determination that the requested data retained independent economic value despite the passage of time and that finding is not against the weight of the evidence.

Finally, Legal Aid contends that the requested data is not a trade secret under § 417.450(4)(a) because the data has "deminimus [sic] value". Based upon the evidence submitted in the record, a finding by the trial court that the data had more than de minimis value is supported by the evidence and is not against the overwhelming weight of the evidence.

In short, while the evidence would certainly have supported a contrary finding, the trial court's finding that the requested data had independent economic value and was a trade secret under § 417.450 was supported by sufficient competent evidence and was not against the weight of the evidence. Point denied.

In its second point, Legal Aid asserts that the trial court erred in finding that the written premium data for 2000 was a trade secret because the trial court viewed the Respondents' evidence without giving sufficient deference to the fact that it was to strictly construe trade secret status as an exception to the Sunshine Law and to liberally construe the provisions of the Sunshine Law. Section 610.011.1 provides that "[i]t is the public policy of this state that ... records ... of public governmental bodies be open to the public unless otherwise provided by law" and that the provisions of the Sunshine Act "shall be liberally construed and their exceptions strictly construed to promote this public policy." Legal Aid contends that the trial court failed to adequately consider the impact of this public policy and the strict construction of exceptions in rendering its judgment.

Legal Aid bases its contention that the trial court did not give adequate consideration to these factors on the fact that they were not specifically referenced in the judgment. Contrary to Legal Aid's assertions, however, a trial court is presumed to have known the law and followed it in rendering its judgment. *State v. Roll*, 942 S.W.2d 370, 374 (Mo. banc 1997); *Haddock v. State*, 75 S.W.3d 872, 877 (Mo. App. W.D.2002); *Dorman v. Dorman*, 91 S.W.3d 167, 171 n. 4 (Mo.App. W.D.2002); *State v. Fuelling*, 145 S.W.3d 464, 469 (Mo.App. W.D.2004). Thus, we must presume that the trial court properly considered the relevant provisions of the Sunshine Law in rendering its decision as long

as that presumption is not rebutted by the record. *See Fuelling*, 145 S.W.3d at 469.

■ Nothing in the record rebuts the presumption that the trial court was aware of the provisions of the Sunshine Law and properly considered those provisions in rendering its judgment. Instead, Legal Aid appears to be arguing that the statute calls for the evidence to be strictly construed against the party attempting to assert an exception to the Sunshine Act, something that the statute does not provide. Point denied.

In its third point, Legal Aid contends that the trial court erroneously determined that the disclosure of the written premium amount for 2000 would inevitably lead to disclosure of the rest of the insurers' zip code data. Legal Aid argues that this finding ignores the fact that any future request for further information would be subject to further judicial review.

While the trial court did offer gratuitous findings to this effect, the trial court offered other unrelated findings that support its judgment. As previously noted, the trial court specifically found that the written premium data for 2000 had economic value and was a trade secret in its own right. That finding was supported by the evidence and was not against the weight of the evidence.

■ In reviewing a court tried case, this Court "is primarily concerned with the correctness of the trial court's result, not the route taken by the trial court to reach that result." *Graham*, 984 S.W.2d at 506. "Thus, the judgment will be affirmed if cognizable under any theory, regardless of whether the reasons advanced by the trial court are wrong or not sufficient." *Id.* Accordingly, regardless of whether the trial court's findings related to the inevitable discovery of other zip code data dealt with issues that were not ripe for adjudication,

the trial court's judgment was supported by other findings and must be affirmed on those grounds. Point denied.

■ In its fourth point, Legal Aid claims that the trial court erred in denying its post-trial motion asking the court to consider allowing the release of the insurers' market share ratios for Kansas City area minority-populated zip codes. Legal Aid asserts that such information is devoid of independent economic value, could yield no advantage to competitors, and that the release of similar data in 1993 showing companies' market share in minority neighborhoods showed no apparent harm to the insurers.

■ "The circuit court is vested with considerable discretion in ruling on a motion to amend judgment ...." *Gill Constr., Inc. v. 18TH & Vine Auth.*, 157 S.W.3d 699, 711 (Mo.App. W.D.2004). This court will not reverse the trial court's denial of a motion to amend judgment absent an abuse of that discretion. *Id.* at 712.

The record reflects that MDI does not currently have the requested data but that it might be able to make such calculations from the data that it has. Legal Aid apparently wanted the trial court to order MDI to analyze the zip code data and release a report similar to one it had released in 1993.

■ Were MDI to create such a document, Legal Aid might well be able to acquire it under the Sunshine Act; however, the Sunshine Act does not empower individuals or the courts to order a governmental agency to create records. *See Jones v. Jackson County Circuit Court*, 162 S.W.3d 53, 60 (Mo.App. W.D.2005). For the purposes of the Sunshine Act, "public records" include only those written or electronic records "that are already in existence that the public governmental

body is 'holding' or 'maintaining' in its possession." *Id.* at 59. "There is nothing in the definition of 'public records,' ... that indicates that it includes written or electronic records that can be created by the public governmental body, even if the new record could be created from information culled from existing records." *Id.* at 60 (emphasis omitted). "The plain language of the Sunshine Law does not require a public governmental body to create a new record upon request, but only to provide access to existing records held or maintained by the public governmental body." *Id.*

Since the record reflects that the data requested in Legal Aid's motion to amend judgment was not contained in an existing record held by MDI, the trial court did not abuse its discretion in denying Legal Aid's post-trial motion. Point denied.

■ In its fifth and final point, Legal Aid contends that the trial court erred in failing to grant its motion to substitute the Concerned Clergy Coalition as a party defendant because the Concerned Clergy Coalition was the real party interested in seeking the written premium data.[6] Legal Aid asserts that it was not a party in interest, that it was misnamed in the action, and that it had a right to have that problem corrected. Legal Aid claims that it was merely acting on behalf of the Concerned Clergy Coalition when it requested the records from MDI.

The primary problem with Legal Aid's argument is that Legal Aid was properly named as a defendant in this action. Legal Aid made the request for Respondents' zip code data from MDI. In making that request, Legal Aid made no mention of doing so on behalf of the Concerned Clergy Coalition or, for that matter, that it was making its request in a representative ca-

pacity for anyone. Legal Aid, in its own capacity, certainly had standing to make such a request under the Sunshine Act and the Open Records Act. MDI subsequently announced its intent to release the zip code data to Legal Aid unless it was enjoined by a court from doing so. Respondents filed their action to enjoin MDI from releasing the requested information to Legal Aid, naming MDI and Legal Aid as party defendants.

Under these facts, we simply cannot find error in the trial court's failure to act on Legal Aid's request to be removed as a party defendant in the action and to have a different party substituted in its place. The Concerned Clergy Coalition may well have been able to file a meritorious motion to intervene in the action pursuant to Rule 52.12(a), but it did not file any such motion. Point denied.

The judgment is affirmed.

All concur.

---

6. The trial court never ruled on this motion, thereby implicitly overruling it.